FARMERS MERCANTILE COMPANY, Appellee, v. FARMERS INS.
Co., Appellant.

**Insurance:** ADJUSTMENT OF LOSS: BREACH OF CONDITIONS: WAIVER:
EVIDENCE. Where an insured, after damage and loss of goods by
fire, instead of complying with the terms of the policy requiring him
to separate the damaged from the undamaged goods and to put
them in the best possible order, proceeded to make sales therefrom
before an opportunity had been given the insurer to inspect and
adjust the loss, there was a breach of the contract which placed it
beyond the power of the insurer to ascertain the damage; and
unless there was a waiver of the condition of the policy in this
respect there could be no recovery. Under the evidence in this case
the question of waiver of the condition was properly submitted to
the jury.

**Same:** WAIVER OF CONDITIONS BY AGENT: EVIDENCE. The adjuster of
an insurance company has authority under the statute to waive the
provisions of a policy requiring the insured, in case of loss, to sep-
arate the damaged from the undamaged goods and to place them
in the best possible condition. Under the evidence it was a ques-
tion for the jury whether the adjuster waived strict compliance
with the above conditions.

**Same:** CONSTRUCTION OF POLICY: ADJUSTMENT OF LOSS: EVIDENCE.
The provision of an insurance policy that in case of loss the in-
sured shall proceed "forthwith" to separate the damaged from the
undamaged goods and to place them in the best possible condition,
contemplates that this shall be done within a reasonable time, in
view of all the facts and circumstances attending the loss and
damage. Under the evidence the question of whether a reasonable
time and opportunity had been given the insurer to ascertain the
loss, before the adjuster abandoned the adjustment, was for the
jury.

**Same:** REPLACING DESTROYED PROPERTY. A policy of insurance provid-
ing simply that in case of loss the company should not be liable
for more than the actual cash value of the property, which should
in no event exceed the cost to the insured of replacing the same with
material of like kind and quality, the company had no right to
repair or replace property rather than pay its value.

**Same:** MEASURE OF DAMAGES. Where a policy of insurance made no provision for determining the amount of loss, further than that the insurer should only be liable for the actual value of the property, in no event to exceed the cost to the insured of replacing the property in like kind and material, the measure of damages was the cost of replacing the property, less the salvage, or the difference between the fair market value immediately before and immediately after the damage occurred; the "actual cash value" being the fair market value.

**Same:** EVIDENCE. The proper method of ascertaining the damage to a stock of goods caused by fire is to show its fair market value immediately before the fire and its fair market value immediately after the fire, and the difference will measure the loss; but after a witness has stated the fair market value before the damage was done he may testify to the percentage or amount of the depreciation or damage to the property, and the admission of such evidence is not reversible error.

**Practice:** OBJECTION TO EVIDENCE. Where a party makes a general objection to evidence and then follows it with a distinct reason for the objection, which is over-ruled as untenable, he cannot fall back upon the general objection for a reversal, although the point urged might fairly arise under the general objection.

**Pleadings:** AMENDMENT: DISCRETION: APPEAL. It is the rule to allow rather than to refuse amendments to pleadings in the interest of justice, or to conform the pleadings to the evidence. The right of amendment, however, is not absolute but is addressed to the sound discretion of the court; and this discretion will not be interfered with on appeal unless substantial prejudice is shown to have resulted to the complaining party.

**Same.** The allowance of an amendment is not in itself erroneous, although objected to on the ground that the adverse party did not have time to meet the new issue thus tendered, unless he asks for time and, if necessary, for a continuance; especially where it was not made to appear that he could produce any additional evidence.

*Appeal from Benton District Court.*—HON. CLARENCE NICHOLS, Judge.

THURSDAY, MAY 15, 1913.

ACTION on a fire policy to recover for damage to goods, occasioned by being removed from a building to avoid de-

struction by fire occurring in the neighborhood of the building in which they were located. Trial to a jury. Verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed*.

*Deacon, Good, Sargent & Spangler,* for appellant.

*M. J. Tobin,* for appellee.

GAYNOR, J.   It appears that on the 27th day of April, 1911, the defendant issued the policy of insurance sued on, insuring the building and stock of goods therein described, owned by the plaintiff and situated in the town of Garrison; that the amount of said policy was $5,000; that on the early morning of September 10, 1911, there was a fire in the town of Garrison, in which practically all the business part of the town was burned, except the building in which the plaintiff's goods were kept; that during the fire the stock insured under this policy was threatened with total destruction by the fire, and the plaintiff, fearing the same, removed the stock from the building across the street, placing them upon the parking, sidewalk, and lawn; that soon after they were removed a very heavy rain came upon the goods and, it is claimed, injured many of them; that after the fire had subsided, the plaintiff returned the stock to the building from which it was taken. It appears, also, that nearly every business building in the town of Garrison was destroyed by that fire, and especially those in the immediate vicinity of plaintiff's building. It appears that during the fire plaintiff's building was kept from destruction by great effort, and that part of the time the building itself was on fire. The plaintiff brings this action upon the policy aforesaid, to recover the damages claimed to have been sustained to his property by reason of the facts aforesaid.

The defendant claims, however, in his answer, after admitting the facts hereinbefore stated, that the policy contained the following clause: "If loss occurs, the insured

shall, as soon as practicable after he ascertains the fact of
such loss, give notice, in writing thereof to the company, pro-
tect the property from further damage, forthwith separate
the damaged from the undamaged, and put it in the best pos-
sible order, and shall, within sixty days from the date of loss,
furnish the company with notice, in writing, accompanied by
affidavit stating the fact as to how the loss occurred and the
extent thereof, so far as such facts are within his knowledge.''
Defendant says that within two days after the fire it sent its
agent to Garrison, and thereupon requested that this pro-
vision of the policy be complied with, and the damaged and
undamaged goods be separated so that the loss, if any, occa-
sioned by the removal be ascertained; that the plaintiff re-
fused to make such separation, and refused to put the same
in the best possible order, as required by the policy, and the
defendant says it was wholly unable to ascertain what loss, if
any, occurred to plaintiff's stock; that the stock had been re-
turned to the building before defendant's agent arrived, and
was in great disorder, and was so commingled that it was im-
possible to ascertain what, if any, goods were damaged, and
the extent thereof; that the only reason assigned by plaintiff
for its refusal to separate the damaged from the undamaged,
and put the same in good order, as required by the policy, was
that it would interfere too much with his business; that at
the time the adjuster arrived the plaintiff was, and had been,
engaged in selling at retail from said stock.

To this answer the plaintiff replied: First, that all the
stock was damaged to some extent; second, denies that the de-
fendant requested that the goods be separated, and says
that as all the stock was damaged, it was impossible, there-
fore, to separate the damaged from the undamaged. Plaintiff,
further replying, said that the goods were in such a condition,
at the time defendant's agent arrived and examined them,
that the loss could be easily ascertained, and says that what-
ever goods were sold by the plaintiff were sold with the knowl-
edge and approval of the defendant, and was made after no-
tice to the defendant that it would be necessary for the plain-

tiff to sell a part of the goods, for the reason that there was no other depot of supplies for goods of that character left in Garrison after the fire.   Plaintiff, in an amendment to his reply, filed at the conclusion of all the testimony, said that two days after the fire defendant's adjuster came and examined plaintiff's stock, and was aware of the sales made, and sales were made while he was there without any objection on his part, but requested plaintiff to separate the damaged from the undamaged goods; that immediately thereafter plaintiff proceeded, at large expense, to separate said damaged goods from the undamaged, and to separate the less damaged from the greater damaged; that on said day the said adjuster entered into negotiations with the plaintiff for the adjustment of the damage, and that the plaintiff and the adjuster spent a great deal of time on the said date in working out and endeavoring to adjust said loss; that he was informed, at the time, the sales had been made from the damaged stock, and he there said that it was all right; when told of the necessity of continuing the sales, he said to go on; that no one could properly object to that, but to separate the goods; that, relying upon those statements and representations, and at large expense to the plaintiff, it did separate all the damaged from the undamaged, and plaintiff says that by reason of the conduct of said adjuster the defendant waived the provision of the policy relied on.

Such are the issues upon which the cause was submitted to the jury.   The jury returned a verdict for the plaintiff. Judgment was entered upon the verdict, and the defendant appeals.

At the conclusion of all the testimony the defendant moved the court to instruct the jury to return a verdict for the defendant, for the reason, among others, that the evidence was without conflict; that a portion of the goods were damaged and a portion undamaged; that the plaintiff failed to separate the damaged from the undamaged, and to place the goods in the best possible order, but, on the contrary,

1. INSURANCE: adjustment of loss: breach of conditions: waiver: evidence.

commenced immediately after the fire to sell the goods, both damaged and undamaged, and sold a large quantity before the defendant had an opportunity to inspect the goods or appraise the damage. This motion was overruled, and of the ruling the defendant complains, and further complains that the court, in submitting the cause to the jury, failed to instruct the jury properly upon this issue. There is no question that this motion should have been sustained, if defendant's contention is true, for it is apparent that such conduct would be a manifest breach of the expressed conditions of the policy. The plaintiff, by such conduct, would disable itself from performing its obligation under the contract, and would put it out of the power of the company to ascertain or appraise the damage.

As said in *Oshkosh Match Works v. Manchester Fire Ins. Co.*, reported in 92 Wis. 510 (66 N. W. 525), speaking of conditions similar to this: "The conditions referred to are substantial and important, and are designed, among other things, to enable the company to fairly investigate and ascertain the loss," and to enable it "to detect dishonest and fraudulent practices. They were conditions for the protection of the company, to be performed after the loss, and, until performed or performance had been duly waived, no recovery could be had upon the policy. We must regard these provisions as having been deliberately agreed to, and with the understanding that they were material and would be performed accordingly; and it is the duty of the court to give full effect to them as written." See, also, in support of this: *Astrich v. German American Ins. Co.* (C. C.) 128 Fed. 477; *Thornton v. Ins. Co.* (C. C.) 117 Fed. 773.

We think that the court in this case recognized the full and binding force of this provision of the contract of insurance, for the court, in the tenth instruction, said to the jury: "If, after the return of the goods to the store, there was in said stock, articles of personal property, damaged and undamaged goods, it then became the duty of the plaintiff, under the

plain terms of the policy, to separate the damaged from the undamaged and arrange all in the best possible order; and, if plaintiff failed to do this, then plaintiff cannot recover, and your verdict should be for the defendant, unless it appears that such failure on the part of the plaintiff was waived by the defendant.''

The plaintiff's reply to the answer of the defendant raised two issues: First. That the goods were all damaged to some extent, and that there were therefore no undamaged goods to be separated, and that this condition of the policy did not apply, because the required separation applied only when there was found to be damaged and undamaged goods. Second. That, if there were damaged and undamaged goods that required a separation under the terms of this policy, the defendant waived its right to insist upon the separation, by reason of the conduct of the adjuster touching this matter. The court, on overruling the motion for an instructed verdict and in submitting the case to the jury, was evidently of the opinion that there was a question of fact for the jury on both these propositions, and if the court was right in this, the overruling of the motion was not an error. The question then is, Was there a conflict in the evidence touching these matters?

It appears that on the second day after the fire one, Kelley, was sent by the defendant company to adjust the loss; that he appeared at plaintiff's store. He testifies:

I first learned of the fire, at Garrison on Monday, September 11th and on Tuesday, the 12th, reached Garrison between 9 and 10 o'clock. I went up to the plaintiff's store and met Mr. Mossman who was in charge. I inquired of him who had the settlement of the loss. He told me the directors. I told him to get them there that I might meet with them. He said he would do so. I glanced over the store and walked back and forth through it, and then went to the bank. About 2 o'clock I met the directors in the bank. I asked them if they were prepared to go into an adjustment, and they wanted to know what was necessary. I said it would be necessary to separate the damaged from the undamaged goods and put them

in shape in the store. They said that would be impossible. It would interfere with their business. I told them that the customary way was to close the store until the adjustment was made. I said if it was impossible for them to do that we could go on and separate the goods and make the appraisement. They seemed to think they could not do that; that the clerks were busy waiting on customers. About that time they sent for Mr. Mossman, and asked his opinion on what the loss might be, and he said what he thought the damage was. I questioned him as to the value of the stock, as to what it was and its character, and gave my opinion as to the proper damage. We did not reach a settlement. They then asked me to retire. Afterwards they sent for me and made another proposition. I told them that I couldn't entertain their proposition without an invoice of the damaged goods, and that, whatever that might be, I was willing to make proof for them of that amount, whether it was more or less. With my knowledge of the business that was the only way to arrive at it. We did not get together. I told them that there must be a separation of the goods and a special invoice of the damaged goods there to ascertain the damage. I called again in the evening. The directors were there. I don't think I was at the store the first time over fifteen minutes, possibly twenty. When I was at the bank, I asked Mossman what the stock was worth. He said $8,000. I was there probably an hour and a half. When I was there in the morning, people were buying goods. They were also buying goods when I was there after dinner and after supper. They told me that they had made sales and would have to make them in the future. They told me there was no other store there. I told them there was only one way to arrive at the damage, and that was by an inventory. I was back on Tuesday, the 19th of September, went into the store, bought a cigar and observed the stock casually. Some people were there buying goods. I had other business there that day. At the time of my last visit to the store I did nothing with reference to adjusting the loss. I learned that day that there had been some men making an appraisement of the damage. When I was there Tuesday, the 19th, I said to Mossman, 'I see you have some of your stock put in position.' I noticed that.

Ravenscroft, testifying on this point said:

We talked with Kelley, the adjuster, during that day while he was there. Kelley said there was no reason why the sales could not be continued when we told him the situation. By the situation I mean the necessity of the people. He said there was no reason why we could not sell the stuff, because we could get it in shape in half a day so that it wouldn't interfere. This conference was at the bank.

Hanna, testifying for the plaintiff, said:

I met Kelley, the adjuster, Tuesday after the fire. He asked if we could separate the damaged from the undamaged goods. We said, 'No, they are all damaged more or less,' and we told him we had been selling the goods. He said that would be expected. It wouldn't be right—it wouldn't be just to the people not to do so. We had explained to him that it was the only store left and the only goods, practically speaking, on the market. He said we had better sell the goods. We could easily keep an account of what was sold.

Calvin Baum, testifying for the plaintiff, said:

I met Kelley at Garrison the Tuesday after the fire, in the bank. He was told there that some of the goods had been sold after being returned to the building and before his arrival. He said, 'Go ahead and sell the goods;' that we could keep track of them, keep an account of them. This was after supper on Tuesday. Mr. Hanna and Mr. Ravenscroft were spokesmen for the company. They were directors. I believe Kelley said they ought to take the damaged goods from the undamaged ones.

Mr. Mossman testified on this point:

We commenced to sell right away on Sunday. When I say that some of the drygoods were separated, what we did was to get those that were completely soaked away from the others. When I say the groceries were placed in the grocery department, I mean that they were placed on the side of the room where we usually keep the groceries. After the goods were brought back in the store, we cleaned and placed the gro-

ceries on the shelves. We tried to mate up the shoes. We brushed and cleaned the drygoods. Mr. Haish helped most of the afternoon in putting the drygoods on the shelves and arranging them. I saw them shake out the drygoods on the counter, and spread them out and smooth them out and fold them, and place them according to his idea of keeping stock. When we got there on Wednesday, this department was in pretty good shape and the grocery stock getting better. There was considerable demand for goods in our line, so that our sales Sunday, Monday, and Tuesday were very large. We sold both damaged and undamaged.

He further testified: ''Mr. Kelley, the adjuster, came on Tuesday after the fire, September 12th.'' He was asked this question, ''What did you do relative to the stock of goods after the fire, as soon as they were returned to the store, during the week following the fire? State the facts.'' He answered:

Employed help and worked at it hard as we could to straighten up; cleaned and brushed them, and put them in a salable condition, as near as could be. Those that were totally destroyed we got out as much as we could. If we could get anything for them, we sold them. The clerks helped us separate and clean up the stock. I worked most of the time after that day in cleaning and separating and straightening up the stock. The clerks took my place in the sale work. Others besides the regular help assisted in classifying and arranging and working about the store, after Mr. Kelley was there on Tuesday. Kelley did not come back after his second visit.

Upon this testimony, the question of waiver of the condition of the policy was submitted to the jury, and evidently from the verdict the jury found that the defendant had waived a strict compliance with this condition.

In *Lake v. Insurance Co.*, 110 Iowa, 473, it is said: ''The test'' of a waiver ''is whether the acts and conduct of the insurer are inconsistent with the intention to insist on a strict compliance with the terms of the policy. . . . Waiver is put upon the ground that an insurer, whose conduct is such as to induce

2. SAME: waiver of conditions by agent: evidence.

the insured to rest under a well-founded belief that strict performance with a condition will not be insisted on, cannot in good faith afterwards set up such nonperformance as a bar to recovery."

That a waiver may be made by an adjuster sent by a company to represent it in the adjustment of a loss, see section 1750 of the Code of Iowa.  See *Lake v. Ins. Co., supra; Corson v. Anchor Insurance Co.,* 113 Iowa, 641, in which it is said: "Where a company, with full knowledge of the facts out of which the forfeiture of the policy arose, by its acts recognized the policy as a valid and subsisting contract, and induced the plaintiff to act in that belief and to incur trouble and expense, such action would be a waiver of the conditions under which the forfeiture arose.  It is not necessary, in order to constitute a waiver, that the facts shall be such as would support a plea of estoppel."  Forfeitures are not favored in the law.  "A waiver  .  .  .  is in effect an election not to take advantage of a technical defense in the nature of a forfeiture, and should be looked upon with liberality rather than with strictness."  In this case there was a clause in the policy requiring the assured to keep its books in an iron safe, and the adjuster, "after being duly advised as to the kind of books which the insured had kept, and well knowing that they were not in compliance with the requirements of the 'iron safe clause,' told the insured that he would have to get duplicate invoices of the goods purchased by him—the originals having been destroyed in the fire—and that the insured" went "to considerable trouble and expense" to comply with this request, and it was held that the conduct on the part of the adjuster amounted to a waiver of a breach of the condition of the policy.  See, also, *Henderson v. Ins. Co.,* 143 Iowa, 572.

In the case at bar it appears that Kelley was sent by defendant company to adjust the loss in controversy; that he appeared at plaintiff's store, walked through the building, and made an observation of the goods, and of the fact that

they were then selling the goods over the counter. It appears that he was informed by the assured, not only of the fact that they had been selling before his arrival, but that they would continue to sell, and of the necessity that existed for a continuation of the business; that he not only did not object to such conduct, but affirmatively assented thereto. It appears, however, that he insisted that they should proceed to separate the damaged from the undamaged, consenting, however, that they might continue the sale of the goods in the regular course of business. It appears that an effort was made at that time to adjust the loss. Propositions and counter propositions were made. At that time Kelley, representing the company, knew what had been done by the plaintiff touching these goods. It appears from his own testimony that he had had large experience in estimating and determining matters of that kind. It appears that the plaintiff made a proposition of settlement and a counter proposition was made by the adjuster. It appears that he insisted upon an inventory of the property before he would proceed with the adjustment, claiming that an inventory of the damaged goods was necessary in order to enable him to do so. It appears that thereafter plaintiff company secured additional help, proceeded to arrange the goods, and, some of the witnesses testified, separated the damaged from the undamaged, and that considerable expense was incurred in respect to that matter; that the adjuster subsequently returned, looked over the store, and remarked: "I see you have some of your stock put in position." He said he noticed that at the time of his last visit. It appears that he did not return, and that nothing further was done in the way of attempting an adjustment of the loss. It appears that thereafter the plaintiff made to the company proofs of the loss as required by the terms of its policy. From this it was apparent that there was a question of fact as to whether or not the defendant company waived, through its adjuster, a strict performance of this condition of the policy, or whether the company, through its adjuster,

led the plaintiff to believe that a strict compliance with the requirements of the policy in this respect would not be insisted on. It was a question as to whether or not the company did not waive any right it had to insist upon a forfeiture, by reason of the sales made by the plaintiff before the arrival of the adjuster. It was a question as to whether or not the adjuster by his conduct, and by what was said and done there by him, did not lead the plaintiff to believe that if the requirements of the policy were thereafter complied with, in the separation and preservation of the property, it would not insist upon that provision of the policy requiring defendant forthwith to separate the damaged from the undamaged goods. It is apparent that great haste was required in removing the goods from the threatened building. It is apparent that great confusion must have arisen in so removing the goods to a point of safety. It is apparent that fair dealing required of the assured that all reasonable means be used to preserve and protect the property from the threatened fire. It is apparent that in returning the goods to the building after the fire had subsided, and to protect them from further damage from the rain, great confusion must have attended the location and placing of the goods in the building. In all cases of this kind much of the work is done by people who have no knowledge of the character of the goods that they are handling.

It is insisted that the policy required the assured to forthwith separate the damaged and undamaged goods, and put them in the best possible order, and it is insisted that this was not done by the assured.

8. Same: construction of policy: adjustment of loss: evidence.

In *Edwards v. Baltimore Fire Ins. Co.*, 3 Gill (Md.) 176-187, 188, it is said: "To give" a "literal import" to the terms "forthwith" and "as soon as possible," as used in policies of insurance, "would, in almost every case of loss by fire," deprive "the insured of all hope for indemnity for the loss incurred; and policies of insurance against fire would, as to

the insured, instead of being contracts of indemnity, as they profess to be, become engines of fraud and injustice in the hands of the underwriters, and a recovery by the insured would be rarely, indeed, if ever, practicable. Such a construction, therefore, has not been sanctioned by the courts. The true meaning of these terms is with due diligence, or without unnecessary procrastination or delay, under all the circumstances of the particular case.''

It is apparent that ''forthwith,'' as used in this policy, means within a reasonable time, considering all the facts and all the circumstances attending the loss or damage. It is apparent (the defendant, through its adjuster, having consented to the sale of the goods without limitation of time) that the goods so sold could not therefore be separated, examined, and appraised. Kelley in answer to an inquiry by the court, said: ''The invoice I have spoken of was simply of the damaged goods. If we had them in position, we could get at them. I said to them [meaning the directors], 'Mr. Mossman is manager of the store. He understands these goods, and I will take my chances with him. We will go through them together and appraise the damage on each and every article invoiced, to arrive at the amount which is due on the damage.' '' But it appears that Kelley never came back, after leaving on that Tuesday, to go through the goods, or to make an examination of them, or to attempt an appraisal of the damages to the goods. The company owed some duty to itself, as well as to the assured in this matter, and it cannot complain because it failed to ascertain for itself, the amount of the loss, and that the court adopted the general rule available in cases of this kind to ascertain the loss. There is no provision of the policy fixing any particular measure of damage, as will hereafter more fully appear.

We think, therefore, there was a question for the jury as to whether or not the defendant waived a strict performance of this condition of its policy. It will be noticed that there is no provision in the policy requiring the plaintiff to

invoice or make an inventory of the damaged goods for the use and benefit of the insurance company. This, however, seems to have been exacted by the adjuster before he would proceed to adjust the loss, and it appearing that the adjuster never returned for any purpose connected with the loss after his first visit, it was a question for the jury as to whether or not a reasonable time had elapsed after the goods were returned to the store to enablé the assured to separate and place them in the best possible order. We think the court did not err in overruling the motion for a directed verdict, and did not err in instructing the jury upon this point.

It is next contended that the court, in the trial of the cause, adopted a wrong method of ascertaining the loss, and permitted witnesses to testify to the value of the entire stock before the loss and the value of the entire stock after the loss as a basis for determining the actual loss; that he permitted some witnesses to testify as to the value of the stock before the loss and the depreciation in per cent or in dollars of the stock as the same was after the fire. It is said that this contravenes the provisions of the policy; that is, the method provided in the policy for ascertaining the damages. The only provision in the policy, other than that requiring separation of the goods, touching this matter is found in section 2 of the policy which reads: ''This company shall not be liable beyond the actual cash value of the property covered by this policy at the time any loss or damage occurs, and said liability, shall, in no event, exceed what it would cost the insured to repair or replace the property, loss or damage with material of like kind and quality.''

4. SAME: replacing destroyed property.

It will be noticed that this provision of the policy does not announce any rule for admeasuring damages. It is simply a limitation on the amount of damages to be recovered. It does not prescribe any method of making the estimate of the amount of loss or damage, but is simply a limitation of the liability, in that it shall not be beyond the actual

cash value of the property at the time any loss or damage occurs, and that the liability shall not exceed what it would cost the insured to replace the property damaged, with material of like quality. This provision of the policy, of course, must govern so far as it applies. This does not give the company, as is done in some policies, a right to repair or replace the property, and this right could not be insisted on unless it was so provided for in the policy.

It will be noticed from this policy that it does not say that the liabilities shall be limited to what it would cost the insurer to replace the property, but what it would cost the 5. SAME: measure of damages. insured, and that, of course, would be the difference between the fair and reasonable market value of the property before the injury and the fair and reasonable market value of the property after the injury or damage. Under this provision of the policy it is apparent that the insurer would not have the right to take the damaged property and replace it with undamaged property, for it gives to the assured no right to abandon the property to the insurance company. Therefore it appears that upon the happening of damage to property, so far as this policy is concerned, the plaintiff was required to keep it in its damaged condition. It is apparent that this provision of the policy does not afford a rule for the admeasurement of damages, and the rule must therefore necessarily be what it would cost the plaintiff to replace the property, less the salvage; and this could only properly be ascertained by determining what the fair and reasonable market value of the property was uninjured, and the fair and reasonable market value of the property in its then condition.

In the case of *Mechanics' Insurance Co. v. Hoover Distilling Co.,* reported in 182 Fed. 590 (105 C. C. A. 128, 31 L. R. A. [N. S.] 873), the court, speaking of a provision of a policy similar to the one in question, said: "Under the policies the actual cash value of the property at the time of the fire was the primary basis for the measurement of liability.

. . . The provision that this liability should in no event exceed the cost to the insured of replacing the property . . . constituted no part of the insured's cause of action upon a breach of the contract. They are inserted in the policy for the benefit of the insurer, and they must be pleaded by the latter if it would diminish or limit the amount of the recovery by reason of them.''

But, even conceding that pleading was not necessary, and the matter was fairly before the court, it will be noticed that it is stipulated that the loss shall be measured by the actual cash value of the property at the time any loss or damage occurs, and that it shall be estimated according to such cash value, but that it shall not exceed what it would then cost the insured to repair or replace the same with material of like kind and quality. It is apparent that this means that when a loss occurred, whether total or partial, the assured would have a right to recover at least what it would cost him to replace the articles with like kind and quality, and if a total destruction occurred, it would mean the fair market value of the property destroyed. The cash value of a thing is its fair market value. There is no other way of determining the value of a thing. In support of this, see: *Chippewa Lumber Co. v. Phenix Ins. Co.*, 80 Mich. 116 (44 N. W. 1055); *Texas Moline Plow Co. v. Insurance Co.*, 39 Tex. Civ. App. 168 (87 S. W. 192); *Osborn v. Phenix Ins. Co.*, 23 Utah, 428 (64 Pac. 1103); *Phillips v. Home Ins. Co.*, 128 App. Div. 528 (112 N. Y. Supp. 769).

In *Manchester Fire Ins. Co. v. Simmons*, 12 Tex. Civ. App. 607 (35 S. W. 722), the court held that market value of an article and its actual cash value are practically the same; that the market value is the actual cash value; that the actual cash value is determined by showing what the market value is; that the actual cash value is the price it would bring in a fair market.

We hold, therefore, that the court did not err in sub-

mitting to the jury the question of the market value, for the purpose of determining the actual cash value.

As to the other points raised by the appellant touching the manner in which the court permitted the plaintiff to show what the damage was, we have to say that the proper and correct method is to show what the fair market value of the property was immediately before the injury, and what the fair market value of the property was immediately after the injury or damage, and the difference constitutes the loss. Yet, however, this court has held that there is no error in permitting a witness to testify, First, as to what the fair market value of the property was before the injury, and then to state, in percentage or in amount, what the depreciation or damage was to the property as it then was.

6. SAME: evidence.

In *Millard v. Webster City*, 113 Iowa, 220, this question was before the court. It appears in the *Millard* case the witness testified as to the value of the property before the excavation in the streets, and when asked its market value immediately thereafter, answered: "Probably a reduction of 25 or 30 per cent." Another, answering the same question, said, "I should think it would depreciate at least one-third," while another witness answered the same question by saying, "I should say $500 or $600 less" than before the injury, and the court said, in respect to this testimony: "While the witnesses might well have been required to make direct answers, it cannot be said, in the light of the record, that any prejudice resulted from retaining the answers given," as these answers "required very simple computation to make them definite," and therefrom fix the value of the property immediately after the injury.

In the case of *Parrott v. C., G. W. Ry. Co.*, 127 Iowa, 419, the court said, in considering a similar question to the one before us: "Instead of requiring the witnesses to estimate the market values of the land before and after the injury complained of, the court allowed them to give the difference between such values, without first stating the values. While

this practice is not to be approved as strictly accurate, it does not under former decisions, constitute reversible error,'' and cites *Millard v. Webster City, supra,* and *Richardson v. Webster City,* 111 Iowa, 427.

So we hold that, though the method adopted by the court is somewhat subject to criticism, it does not constitute reversible error, and we might remark in passing that the objection urged to much of this testimony did not raise the question that counsel now urges.

7. PRACTICE: objection to evidence.

For instance, the objection made to the evidence offered was that it was incompetent, irrelevant, and immaterial; that the evidence discloses no effort made to separate and appraise the value of the damaged goods separately, and the evidence called for in no sense followed the provisions of the contract as to the method of ascertaining the damages, and that the witness has not shown himself competent to fix the value of the goods, after they were returned to the store, and for the further reason that the policy itself provides a specific method of getting at the loss, and provides just what the duty of the assured is. Nowhere was the court's judgment challenged, in so far as the evidence might have been objected to, as calling for a conclusion of the witness. In every case in which the counsel urged as an objection ''that it was incompetent, irrelevant, and immaterial,'' the objection was immediately followed by the assertion that it was immaterial, incompetent, and irrelevant because it did not conform to the method pointed out by the policy itself for the admeasurement of damages; and it has been held that where general objections are urged, and specific reasons given for the objections, the court is justified in relying on the reasons assigned for the objections. See *Hamilton v. Mendota Coal Mining Co.,* 120 Iowa, 147; *Brier v. Davis,* 122 Iowa, 61; *Page & Son v. Grant,* 127 Iowa, 253, in which the court says: ''An objection should be such as to apprise the trial court of the exact point upon which counsel relies.'' An objection, therefore, cannot be made in general terms, and then a dis-

tinct and direct reason given for the objection, and urged upon the court, which is not tenable, and is therefore overruled, and counsel thereafter permitted to go back of the reason assigned and rely on some other point which may be covered by the general objection, and secure a reversal thereby. Counsel may stop, upon making the general objection incompetent, irrelevant, and immaterial, and, if overruled, rely upon any one of the three objections, but it cannot make the general objections and urge specific and distinct reasons for making these, and lead the court into believing that the general objections are urged upon this reason, and thereafter insist that the court erred in overruling the objection upon the general objections made, upon points not called to the attention, or urged before the court.

In *Puth v. Zimbleman,* 99 Iowa, 647, the court said: ''The objection lodged against . . . the evidence . . . was that it was 'incompetent and immaterial, for the reason that the evidence discloses that the letter has been in the possession of the plaintiff and his wife, and it was written by her, and for the further reason that anything she may say in the matter is not binding upon him.' The proposition now argued is that the letter was written after the wrong complained of had been committed. We have often held that the grounds of objection must be stated, so that the court may know upon what the objector relies.'' So it appears that it has been the holding that if the special objection urged on the court, and called to the attention of the court, and relied upon by the objector, is not good, and is properly overruled, the objector thereafter cannot fall back upon the general objection for a reversal, although the general objection, fairly considered, might have raised the point urged. See, also, in support of this, *Coad v. Schaap,* 144 Iowa, 242, 243.

But, even if the objections were sufficiently specific, we think, under the rule laid down in *Millard v. Webster City* and *Parrot v. C. G. W. Ry. Co., supra,* there was no error in overruling the objection.

It is next urged that the court erred in permitting the plaintiff to file an amendment to its reply after the evidence was all introduced, and in overruling defendant's motion to strike the amendment from the records. Upon this point we have to say that the rule is to allow amendments rather than to refuse them. Especially when substantial justice will thereby be promoted. The practice in this state is very liberal in allowing amendments, especially where the object is to make the pleadings conform to the proof. They should always be allowed when the tendency is to advance justice. The right to amend is not an absolute and unconditional right, but is allowed in the sound discretion of the court, in furtherance of justice, and the question whether an amendment shall be allowed is addressed to the sound discretion of the court. It is within the discretion of the court to permit an amendment to be made to the pleading at any time, where the amendment contains matter material to the proper determination of the case. See *Clough v. Adams,* 71 Iowa, 17.

8. PLEADINGS: amendment discretion: appeal.

The discretion lodged in the trial court to allow or reject amendments will not be interfered with on appeal, when substantial prejudice is not shown to have resulted to the party complaining. See *Guyer v. Minnesota Threshing Machine Co.,* 97 Iowa, 132; *Williams Shoe Co, v. Gotzian,* 130 Iowa, 710.

Where an amendment is offered and allowed, it will not constitute error in itself, although the defendant objects at the time, on the ground that he had not proper time to meet the issue presented by it, for he may ask for time to meet such issue, and, if necessary for continuance, to enable him to produce the evidence which he desires, and if he does not do so, he cannot complain of the allowance of the amendment and have a new trial, or a reversal, on the ground that said amendment was allowed over his objection; and this is especially true where it does not appear that he could produce other evidence than was offered

9. SAME.

on the trial, and where it does not appear that on the new trial any additional evidence could be offered, or would be offered, than was offered upon the trial. See *Leek v. Chesley,* 98 Iowa, 593; *Clough v. Bennett,* 99 Iowa, 69.

There are other assignments of error, but we think they are not well taken, or they are all covered by what has been heretofore said. We find no reversible error in the record, and the cause is therefore *Affirmed.*