## PHOENIX INSURANCE COMPANY *v.* FLEENOR.

### Opinion delivered May 20, 1912.

1. PARTNERSHIP—AUTHORITY OF PARTNER TO SELL PARTNERSHIP PROPERTY.—While a partner has implied authority to dispose of the personal property of the firm, a sale thereof by him is usually binding upon the partners only when he makes the transfer in the course of trade and incidental to the regular business of the firm. (Page 126.)

2. FIRE INSURANCE—BREACH OF WARRANTY OF OWNERSHIP.—Where, in an action upon a policy of fire insurance covering personal property, the defense was that there was a breach of the warranty of absolute ownership of the insured property, an instruction that a member of a partnership would have a right to dispose of same, while erroneous, was not prejudicial if the jury were also told that if the other partner owned the property jointly or solely, there was a breach of warranty. (Page 126.)

3. SAME—WARRANTY AS TO USE OF KEROSENE—CONSTRUCTION.—A clause in a policy of fire insurance, stipulating that kerosene oil "may be used for light and kept for sale according to law, but in quantities not exceeding five barrels, provided it be drawn and lamps filled by day light, or not less than ten feet from artificial light," is a regulation of the use of kerosene oil for lighting purposes, and does not prohibit its use for other purposes than for lights. (Page 127.)

4. SAME—WARRANTY AS TO OWNERSHIP.—A provision in a lease that the landlord should have a lien upon the personal property of the tenant on the premises did not amount to a mortgage, nor affect the title of the tenant, within the meaning of a clause in a policy of in-

surance of the tenant's property which warranted the tenant's absolute ownership. (Page 128.)

5. SAME—LIABILITY FOR ATTORNEY'S FEE.—To render a fire insurance company liable for an attorney's fee when it failed to pay a loss, it is not necessary that there should have been a formal demand for payment of the policy; it is only necessary to show facts from which it can reasonably be inferred that the insurer understood that payment was demanded and that it refused to pay. (Page 129.)

6. SAME—FIXING AMOUNT OF ATTORNEY'S FEE.—It is immaterial that no proof was taken upon the question of a reasonable attorney's fee where the court which fixed the fee was familiar with the case and the service done by the attorneys therein. (Page 129.)

Appeal from Garland Circuit Court; *Calvin T. Cotham,* Judge; affirmed.

STATEMENT BY THE COURT.

This is a suit for $1,071.43, by appellee against the insurance company on a policy insuring her against fire loss on hotel and office furniture at the Southern Hotel at Hot Springs. It was alleged that the conditions of the policy were complied with, that a loss had occurred, and judgment prayed for said amount, with 12 per cent. penalty and an attorney's fee.

The insurance company denied all liability on the policy, and claimed a forfeiture thereof on account of a violation by the insured of the conditions of the policy as to the sole and unconditional ownership of the property by the insured, the incumbrance thereof by chattel mortgage, and the unrestricted use of coal oil on the premises, setting out the provisions of the policy relating thereto; the one as to the coal oil reading as follows:

"This entire policy, unless otherwise provided by agreement, indorsed hereon or added hereto, shall be void * * * if the interest of the insured be other than unconditional and sole ownership, * * * or if there be kept, used or allowed on the above described premises * * * petroleum or any of its products of greater inflammability than kerosene oil of the U. S. Standard (which last may be used for lights and kept for sale according to law). * * * No suit or action on this policy for the recovery of any claim shall be sustained in any court of law or equity until after

full compliance by the insured with all the foregoing requirements."

The property insured was situated in the Southern Hotel at the time of the loss, and appellee had $3,500 insurance in three companies, $1,250 of which was with appellant company. The two other companies adjusted the claims upon proofs of loss furnished and settled with appellee. The adjuster for this company copied one of the proofs of loss furnished one of the other companies, and gave it to one of its clerks in the office of its local agent at Hot Springs, and had appellee to sign and swear to it, and, as said in its brief, appellant took sixty days time permitted by its policy, before the loss became payable, in which to pay. It also admits that the testimony was sufficient to sustain the finding of the jury as to the amount of loss and damage caused by the fire.

The policy was introduced in evidence, containing the clauses and conditions relative to forfeitures, as set out in the answer.

The proof tends to show that the appellee was the owner of all the furniture in use in the Southern Hotel, covered by the policy at the time of the issuance thereof. She purchased some of it from one R. H. Pearce, and paid therefor $200. She testified that she bought this furniture at the Moore Flats, and moved it to the Southern Hotel; that Pearce came to the Southern Hotel some time in January, and acted as manager for her; that no furniture was moved from the Moore Flats for use in the hotel, except what she bought, but that Pearce stored some old furniture in a back room on the first floor which was not fit for use; that when she purchased the furniture from Pearce he represented that he was the sole owner of it; that one of her checks given in payment for it was indorsed by Pearce and C. H. Pullen, and four of the other checks were indorsed by Pullen; that she was the sole owner of all the furniture contained in the Southern Hotel at the time of the fire, and no one else had any interest in it whatever, either at the time she insured it or when the loss occurred.

Pullen stated that he was proprietor of the United States Hotel in 1908, and had been for some years, and had accumulated a lot of surplus furniture, which he desired to

dispose of, and, not being able to do so, decided to rent a rooming house and furnish it; that he made a contract with R. H. Pearce to take charge of the furniture, and they arranged to rent the Moore Flats, a sixteen-room house, and furnish them with it. Pearce was to be equally liable for the rent and expenses of operating the business, and they were to divide the profits equally until the business could be disposed of. In December, 1908, Pearce thought they could do better in the Southern Hotel, and they hoped to secure a purchaser more readily by making the change. "When the change of houses was made, Pearce and I had another agreement. I permitted him to move my furniture to the Southern Hotel, which was sufficient to only partially furnish it." That they finally bought, jointly, $400 worth of furniture, with the understanding that when a sale of the business was had Pullen was to receive the full value of said new furniture. "After waiting several months for Pearce to make a sale of the business and seeing no prospect for a sale in the near future, I saw him and threatened to take the furniture away from the house. A disagreement arose as to the amount I owned. We tried to make a deal, whereby he was to take all of it in his own right and pay me a reasonable price therefor, but could not agree on the price. I then placed the matter with an attorney for adjustment, but before it was settled Pearce was killed. After his death, I learned that Mrs. Fleenor claimed everything in the house, but, knowing her as I did, I did not go to see her relative to the property, as I did not want to have any controversy with her. It was my intention to bring an action in replevin against her for the property, and would have done so, if it had not been destroyed by fire. I sued her for the value of it, and garnished the insurance company, but dismissed the case, upon advice from my attorney that I could not recover from the insurance company in any event, as the insurance was in her name, and that if I established title to the furniture it would defeat the collection of the insurance by either party."

There was testimony tending to show that one or two quart bottles of coal oil were found between the ceilings and walls of the different stories of the hotel when it was torn down after the fire, and that coal oil was also discovered in slop jars up

in the attic. The coal oil was first kept in a barrel on the back porch of the second story of the hotel, which extended out to the ground on the mountain side, and later in an iron tank at the same place. it was used for lighting lamps, and a good many rooms in the hotel were heated by burning it in oil heaters therein; about two gallons per day to the heater. Appellee stated that she did not conspire with any one to burn the house; did not put coal oil, or have any one else to place it around the house, except the oil that was kept in the tank. That she bought oil for the hotel in barrels, used it for lighting lamps and for heating about eight rooms of the hotel, which had no flues, by burning it in oil heaters. That she did not have the oil placed in bottles between the ceilings or in any vessel. That she did use a disinfectant in the form of crude carbolic acid, and placed it in slop jars in the rooms every day. The iron tank, which held fifty-two gallons of coal oil was on the back porch at the time of the fire, had been opened and about ten gallons of oil drawn out. The fire did not originate anywhere near this porch or tank of oil. Some of of the firemen stated that the odor of coal oil was very strong in the smoke when they arrived at the fire, while others stated that they were not able to detect any such odor.

A lease under which the insured occupied the premises was introduced in evidence providing for the payment of $900 a year rent, $75 a month, payable in advance on the first day of each month, which also contained provisions for the forfeiture of the lease, in case of failure to pay the rent as agreed, and that the whole amount thereof should become due on such forfeiture. That the lessee could distrain for any rent due, with a waiver of a right to claim any exemption of property from execution and distress; and this clause concluded: "Meaning and intending hereby to give to the said party of the first part, and his heirs, executors, administrators and assigns, a valid and first lien upon any and all goods, chattels, furniture, or other property belonging to the said party of the second part that are now in said leased premises, or that may be placed and put in said premises during the term of this lease, as security for the payment of said rent in manner aforesaid, anything hereinbefore contained to the contrary notwithstanding."

The next clause provided that if the term shall be ended at the election of the lessor, or in any other way, the lessee does "promise and agree to surrender up said above described premises and the property upon which a lien is hereby given, peaceably, etc."

The lease was in force when the policy was issued, but no lease had been signed after its expiration for the next year during which the fire occurred, although the hotel was occupied on the same terms.

The court instructed the jury, giving, over appellant's objections, instructions numbered 1, 4 and 10, which are as follows:

"1.    The jury is instructed that, should they find from the evidence that Pullen and Pearce were partners in the furniture contained in the Moore apartments, either partner would have the right to dispose of the same, and his contract of sale would be binding on the other."

"4.    The jury is instructed that the lien specified in the lease was not a chattel mortgage under the terms of said insurance policy."

"10.    If you find from the evidence that the fire which destroyed the property insured under this policy was caused by the failure of the insured to comply with the clause of the policy restricting the use of kerosene oil kept on the premises, you will find for defendant."

And in refusing to give, for it, instructions numbered 5, 6 and 7, as follows:

"5.    If you believe from the evidence that plaintiff used coal oil stoves in said building, in which coal oil was used as a fuel, you will find that said policy was avoided."

"6.    If you find from the evidence that vessels of oil were concealed or left scattered about the hotel with the knowledge of plaintiff, you will find for defendant."

"7.    If you find from the evidence that coal oil was stored in the building in large quantities and not for sale, or to be used for lights, with the knowledge of plaintiff, then you will find that said policy was avoided."

The jury returned a verdict for appellee, and from the judgment thereon the insurance company appealed.

*A. B. Belding* and *Cockrill & Armistead,* for appellant.

1.   It was error to deny a continuance.

2.   The lease constituted a chattel mortgage which avoided the policy.  33 Ark. 387.  Although not acknowledged, it was good between the parties.  77 Ark. 57; 67 *Id.* 266; 68 *Id.* 162.  The expiration of the lease before the fire avails nothing (1) because it was renewed, and (2) because the mortgage existed during the life of the policy and avoided it.  62 Ark. 348; 64 N. W. 206.

3.   Appellee avoided her policy in the use of and abuse of coal oil.   Clement on Fire Insurance, vol. 2, pp. 290-310.

4.   It was error to exclude the testimony of C. H. Pullen and Mrs. Lawrence.

5.   There was error in the court's charge.   One partner has no right nor implied authority to dispose of partnership assets.  22 A. & E. Enc. Law, 149.   A breach of a provision of a policy, individual and entire, as to a part avoids the entire policy.  52 Ark. 257; 63 *Id.* 187.

6.   The penalty and attorney's fee should not have been allowed.  88 Ark. 473.

*James E. Hogue,* for appellee.

1.   'Appellee was the sole and exclusive owner.   A partner can dispose of the entire partnership assets of the firm, if in the course of trade.  30 Cyc. 495.

2.   A chattel mortgage must be *legally operative* before it avoids a policy.  2 Clements on Fire Insurance, pp. 195-6, and cases cited.

3.   A policy is not avoided by the mere use of coal oil in a lamp as part of an oil stove for cooking.  2 *Id.* 335-6-7. The only question of *increase of hazard* was submitted to the jury as a question of fact.  *Id.* 336-7.

4.   Attorney's fee and penalty were properly allowed, and there is no error in the court's charge.   Acts 1905; 95 Ark. 389.

*A. B. Belding* and *Cockrill & Armistead,* in reply.

1.   Cite on question of attorney's fee and penalty:   95 Ark. 389; 59 S. W. 61; 130 *Id.* 769; 131 *Id.* 406; 109 *Id.* 1084; 92 *Id.* 387; 98 *Id.* 132.

2.   An increase of hazard avoids a policy.  2 Clement, Fire Ins. 290; 57 N. Y. 274; 28 N. E. 868; 85 Ia. 643; 50

Conn. 551; 68 N. E. 551; 30 Me. 273; 64 N. W. 527; 2 Clement, Fire Ins., Rule 31-33; 80 N. W. 971; 33 So. 163; 81 Ia. 496; 135 Ala. 256; 200 Pa. St. 325; 49 Atl. 767.

KIRBY, J., (after stating the facts).  It is contended, first, that the court erred in giving instruction numbered 1; and we do not agree with its correctness as an abstract proposition of law, for, while a partner has implied authority to dispose of the personal property of the firm, it is usually only when he makes the transfer in the course of trade and incidental to the regular business of the firm that it is binding upon all the partners in favor of a *bona fide* transferee.  30 Cyc. 495.

We think no prejudice resulted to appellant from the giving of this instruction, however, because the court at its request told the jury that if Pullen owned part of the furniture used in the hotel at the time of the issuance of the policy, or if Pullen and Pearce owned a part thereof jointly at that time, it amounted to a breach of the warranty, and avoided the entire policy; and, even if they should find that the plaintiff acquired the interest of Pearce before the policy was issued, if they believed that Pullen still owned an interest, either solely or jointly, in any part of the furniture, it would avoid the policy.  That, if plaintiff was not the sole and unconditional owner of all the property insured at the time of the issuance of the policy, there was a breach of warranty which avoided the policy, regardless of what the plaintiff thought and believed about her ownership.

The testimony shows that there was no partnership agreement between Pullen and Pearce, after their agreement to move from the Moore Flats, and had not been relative to the $400 worth of furniture jointly purchased by them, and Pullen's statement shows that he authorized the sale of his furniture by Pearce, and the evidence tended to show that he had indorsed four of the checks given in payment by Mrs. Fleenor for the $200 worth of furniture purchased from Pearce by her, and it was undisputed that he made no claim of ownership of any of the property until after the fire, notwithstanding he knew it had been purchased by Mrs. Fleenor long before the fire occurred.  She stated that no other furniture than the $200 worth she purchased from Pearce was removed from the

Moore Flats to the Southern Hotel for use therein, and that she was the sole and unconditional owner of all the furniture used in furnishing the hotel at the time of the issuance of the policy and the fire; and this question was fairly submitted to the jury upon the instructions given, and they have found the issue in her favor.

2. The next contention is that the policy was avoided by a violation of the clause relating to the use of coal oil; that the court erred in giving instruction numbered 10, and in refusing appellant's requested instructions numbered 5, 6 and 7.

Under said clause of the policy relating to kerosene oil, the words in parentheses, applicable thereto, "(which last may be used for light and kept for sale according to law, but in quantities not exceeding five barrels, provided it be drawn and lamps filled by daylight, or not less than ten feet from artificial light)" import a regulation of the use of kerosene oil for lighting purposes, and the condition does not prohibit its use for other purposes than for lights, and the use thereof in heaters to warm the rooms did not avoid the policy, there being no question that the oil was of the prescribed standard, or that the loss was caused by drawing or filling lamps at night in less than the prescribed distance from artificial light. 2 Clement, Fire Insurance, 336.

As said, it was only intended as a regulation or restriction of the use of the oil for lighting purposes and the quantity kept for sale, and the policy would not have been avoided under this clause if oil was kept and stored about the premises, so long as the quantity was not greater than the amount allowed thereunder.

The court told the jury that if the fire which destroyed the property was caused by the failure of the insured to comply with the clause of the policy restricting the use of kerosene oil on the premises they would find for the company, and committed no error in refusing to give appellant's said requested instructions numbered 5, 6 and 7.

There was no claim made in the court below that the hazard was increased by the use of coal oil or storing it in any particular way, nor was any instruction asked in relation thereto, and appellant only urges it now in its reply brief, which comes

too late to avail of a defense that should have been insisted upon in the trial court.

3. It is next contended that the court erred in giving instruction numbered 4, declaring that the lien specified in the lease was not a chattel mortgage under the terms of the insurance policy.

Our law does not recognize the remedy of distraint for the collection of rent as it existed at the common law, and, by the terms of said lease, a lien only against the furniture of appellee was given as a security for the payment of any rent that should become due and be not paid at the time thereof.

It contains no words of conveyance of the property, and had no effect to transfer the legal title thereof to the lessor, nor was it intended by the parties to have any such effect. Under it, the lessor could not have taken possession of the property from the lessee, by replevin, and his only remedy would have been to enforce the lien against it by a suit in equity. It was intended only as a security, and a chattel mortgage is more than that. *Perry County Bank* v. *Rankin*, 73 Ark. 589.

"Such a mortgage is something more than a mere security. It is a conditional sale of chattels and operates to transfer the legal title to the mortgagee, to be defeated only by a full performance of the condition." Jones on Chattel Mortgages, § 1; Cobbey on Chattel Mortgages, § § 2, 4.

It is true that it was held in *Mitchell* v. *Badgett*, 31 Ark. 394, that a lease of land duly executed by a landlord and tenant, in which a lien was expressly given and reserved upon all the crops produced upon the land by the tenant, and which provided that no part of same should be removed or disposed of in any way by the tenant or his agent until the note had been paid, or with the consent of the landlord, amounted to a mortgage. But that was a proceeding in equity to enforce a lien and declare a trust against the property subject to the lien in the hands of another which would and could have been done without regard to whether the instrument was a chattel mortgage, or only gave a lien as security.

The lien in this case could have been regarded as an incumbrance, but no provision was made against incumbrances, and it did not affect the title of the insured, the rent always

having been paid in advance and none ever having become due, for which the lien attached as security even.

It is last contended that the court erred in assessing the penalty and allowing an attorney's fee. Appellant in its brief states that it copied a proof of loss submitted to one of the concurring insurance companies and sent it to the insured to be sworn to, and concluded to take the full time prescribed in the policy in which to pay the loss. It did not pay the loss, as it agreed to do, within the time prescribed in the policy after proof of loss was made, and, being sued, denied liability upon the policy. It gave the insured no intimation that the proof of loss so made out at its instance was not satisfactory, and that the amount, as adjusted, would not be paid within the time prescribed in the policy; neither did it claim exemption from payment because of a garnishment served on it, and it did not fail to pay because of a lack of demand, but on account of its denial of liability.

In *Metropolitan Life Insurance Co.* v. *Shane,* 98 Ark. 137, the court said: "It is not necessary that there should have been a formal demand for payment of the policy before the penalty for its nonpayment would attach. It is only necessary to show facts from which it can be reasonably inferred that the company understood that payment was demanded and that it refused to make same."

As already stated, the company made no excuse for a failure to pay within the terms of the policy after proof of loss made, and, by its conduct in so doing after concluding to take the full time and subsequently resisting payment on the ground that it was not liable on the policy, it evinced a refusal to pay after it understood payment was demanded.

A mere formal demand would have effected nothing, and, under the circumstances, it was not required to be made, and the court committed no error in assessing the penalty and attorney's fee against it, pursuant to the statute.

It is also true that the record does not show that any proof was taken upon the question of a reasonable attorney's fee before one was fixed by the court, but he had the whole matter before him, was familiar with the case and the service done by the attorneys therein, and we can not say that there was no evidence warranting his fixing the amount of the fee,

which was a matter within the discretion of the court. Neither do we think the amount allowed is excessive.

Finding no prejudicial error in the record, the judgment is affirmed.