## NEW YORK UNDERWRITERS' FIRE INS. CO. v. MALHAM & CO.

## STERLING FIRE INS. CO. v. SAME.

Circuit Court of Appeals, Eighth Circuit.
March 30, 1928.

Nos. 7982, 7983.

**1. Insurance ⊚⇒505—Under fire insurance policy provision requiring insured to protect property and separate damaged from undamaged property, insured cannot recover in absence of waiver, where he sells property before insurer had opportunity to appraise damage.**

Under provision of fire insurance policy which requires insured to protect property and separate damaged from undamaged property, etc., insured cannot recover on policy in absence of waiver, where he sells property before insurer has reasonable opportunity to inspect it or appraise damage.

**2. Insurance ⊚⇒146(3)—Forfeitures of insurance policies are not favored.**

Forfeitures of insurance policies are not favored in law.

**3. Insurance ⊚⇒388(3)—Waiver of compliance with provisions of fire insurance policies, may be inferred from insurer's conduct.**

Estoppel and waiver of compliance with provisions of fire insurance policies, may be inferred from conduct of insurance company.

**4. Insurance ⊚⇒668(2)—Whether fire insurance adjuster represented all insurers or whether his acts were ratified by defendant insurer was fact question.**

In suit on fire insurance policy, where property was covered by policies in four insurance companies, question whether adjuster making offer of settlement represented all insurance companies, or whether his acts were thereafter ratified by insurance company claiming he was not representing it was fact question.

**5. Appeal and error ⊚⇒1010(1)—Trial court's findings of fact will not be disturbed if there is substantial evidence supporting them.**

Where jury is waived and case is tried to court, trial court's findings on questions of fact will not be disturbed if there is any substantial evidence to support them.

**6. Evidence ⊚⇒20(1)—It is common knowledge that, where loss covered by several policies occurs, adjuster seldom appears for each of insurers.**

It is matter of common knowledge that, where loss occurs and is covered by number of fire insurance policies, it is seldom that an adjuster appears for each one of companies.

**7. Insurance ⊚⇒76—Evidence sustained finding that fire insurance adjuster making offer of settlement represented defendant as well as other insurers.**

In suit on fire insurance policy covering property which was covered by policies in four insurance companies, evidence *held* sufficient to sustain finding that insurance adjuster making offer of settlement represented defendant.

8. Insurance ⚖➡665(8)—Where insured sold merchandise damaged by fire before sending proofs of loss, evidence sustained finding that insurer waived salvage clause provisions.

Where insured merchandise stock was damaged by fire and insured had fire sale to dispose of damaged merchandise before proofs of loss were sent to insurance companies, and later adjuster representing fire insurance companies made offer of settlement, evidence *held* to sustain finding that insurance companies waived provisions of policies giving them right to examine salvaged stock and have an appraisal and take same at appraised value or replace property lost or damaged with other of like character.

9. Insurance ⚖➡665(1)—Evidence in suits on fire insurance policies warranted holding that insurers elected not to take salvaged goods.

In suits on fire insurance policies covering stock of merchandise, evidence warranted holding that insurance companies elected not to take salvaged goods.

10. Insurance ⚖➡335(3)—Fire insurance policy clause requiring insured to keep certain books is enforceable.

Clause of fire insurance policy requiring insured to keep detailed inventory and set of books which shall clearly present complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, is enforceable.

11. Insurance ⚖➡335(3)—Substantial compliance with fire insurance policy provision requiring insured to keep set of books is sufficient (Crawford & Moses' Dig. Ark. § 6148).

Under Crawford & Moses' Dig. Ark. § 6148, substantial compliance with fire insurance policy provision requiring insured to keep detailed inventory and set of books showing business transacted, purchases, sales, and shipments, both for cash and credit, etc., is all that is essential.

12. Insurance ⚖➡335(3)—If insured's books, unaided by oral testimony, furnish information necessary to determine loss, fire insurance policy clause regarding keeping books is complied with.

If books themselves kept by insured, unaided by oral testimony, except to explain method in which they were kept, furnish requisite information necessary to determine extent of loss, intent and purpose of fire insurance policy clause requiring insured to keep set of books showing business transacted, purchases, sales, and shipments, both for cash and credit, etc., is accomplished.

13. Insurance ⚖➡335(3)—Insured held to have substantially complied with fire insurance policy provision requiring keeping of books showing business transacted, etc. (Crawford & Moses' Dig. Ark. § 6148).

Insured *held* to have substantially complied with clause of fire insurance policies covering stock of merchandise requiring insured to keep inventory and set of books showing business transacted, etc., which is sufficient under Crawford & Moses' Dig. Ark. § 6148.

14. Insurance ⚖➡665(1)—Evidence held to show insured made demand on insurer within statute providing for additional damages for failure to pay fire loss within time specified; formal demand not being necessary.

Evidence showing that insured was endeavoring to have policies paid and that insurer understood that payment was demanded *held* sufficient to show demand by insured within meaning of Arkansas statute, providing that, where loss occurs under fire insurance policies and company fails to pay within time specified in policy after demand, company shall be liable for 12 per cent. damages on amount of loss, since it is not necessary that there should have been formal demand for payment.

15. Insurance ⚖➡602—In suits on fire insurance policies commenced in state court and removed to federal court, attorney's fees provided by state statute where insurer does not pay loss within time specified could be taxed as costs.

In suits on fire insurance policies commenced in state court and removed to federal court, attorney's fees provided by Arkansas statute where insurer fails to pay loss within time specified in policy after demand could be taxed as costs.

16. Insurance ⚖➡553(1)—Where court found fire loss to be $21,000, amount of $24,423.20 stated in proofs of loss did not warrant assumption that insured's affidavit was willfully false.

Where trial court found loss to be $21,000 in suits on fire insurance policies, amount stated in proofs of loss, $24,423.20, *held* not to warrant assumption that insured's affidavit was willfully false.

17. Insurance ⚖➡661—In suits on fire insurance policies, permitting inventory compiled from yearly invoices as evidence of goods on hand when fire occurred held not error, where books showing purchases and invoices were introduced.

In suits on fire insurance policies covering stock of merchandise, permitting inventory compiled from yearly invoices to be introduced as evidence of stock of goods on hand at time of fire *held* not error, where books of insured were introduced showing amount of merchandise purchased, and all invoices were introduced.

18. Appeal and error ⚖➡197(8)—Objection that waiver was not pleaded, not made during trial, could not be raised on appeal.

Where no objection was made to evidence on ground that no waiver was pleaded of certain provisions in fire insurance policies, but case was tried on theory of claimed waiver of such provisions, question could not be raised on appeal.

19. Appeal and error ⚖➡1058(1)—Excluding evidence that special agent and fire insurance adjuster calling on insured were not defendant's representatives held harmless, where parties testified to matter themselves.

In suits on fire insurance policies covering property covered by policies in four companies, excluding evidence that special agent and insurance adjuster calling on insured after fire did

not represent defendant *held* harmless error, where parties themselves testified to matter.

In Error to the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suits by Malham & Co., a partnership composed of Raymond Malham and others, against the New York Underwriters' Fire Insurance Company and against the Sterling Fire Insurance Company. The cases were consolidated and tried together. Judgment for plaintiff, and defendants each bring error. Affirmed.

R. Lee Bartels, of Memphis, Tenn., for plaintiff in error New York Underwriters' Fire Ins. Co.

Thomas Clark Trimble, of Lonoke, Ark., for plaintiff in error Sterling Fire Ins. Co.

W. Wilson Sharp, of Brinkley, Ark. (G. Otis Bogle, of Brinkley, Ark., on the brief), for defendant in error.

Before LEWIS and KENYON, Circuit Judges, and KENNEDY, District Judge.

KENYON, Circuit Judge. The stock of merchandise of defendants in error, a partnership composed of Raymond Malham, Joe Malham, and R. Mahfouz (hereinafter designated the insured), engaged in the mercantile business at Brinkley, Ark., was partially destroyed by fire on the 12th day of December, 1926. The New York Fire Insurance Company, plaintiff in error in case No. 7982 (hereinafter designated the New York Company) had issued a policy which was in effect at the time of the fire covering insured's stock to the extent of $4,000. The Sterling Fire Insurance Company (hereinafter called the Sterling Company), plaintiff in error in case No. 7983, had a similar policy covering said stock. Two other companies had policies thereon. Suits were brought against the New York Company and the Sterling Company to recover on the policies in the state court of Arkansas, and duly removed to the federal court. The cases were there consolidated and tried together. A jury was waived by written stipulation, and the trial court found in favor of the insured on both policies and entered judgments thereon. Certain questions involved in the writs of error are common to both companies. We consider both writs in this opinion.

The contract of the New York Company contains the following provision:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained, or estimated, according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality; said ascertainment, or estimate, shall be made by the insured and this company, or, if they differ, then by appraisers as hereinafter provided; and the amount of loss, or damage, having thus been determined, the sum for which this company is liable pursuant to this policy shall be payable sixty days after due notice, ascertainment, estimate, and satisfactory proof of the loss have been received by this company, in accordance with the terms of this policy. It shall be optional, however, with this company to take all, or any part, of the articles at such ascertained or appraised value, and also to repair, rebuild, or replace the property lost or damaged with other of like kind and quality, within a reasonable time on giving notice within thirty days after receipt of the proof herein required, of its intention so to do.
* * * *"

The contract provided for giving the insurance company notice in writing of loss in case of fire, the protection of the property by separation of damaged from undamaged goods, the making of a complete inventory, etc., and within sixty days after fire making proof of loss, the loss not to be payable until sixty days after such notice; also "no suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity until after full compliance, by the insured, with all the foregoing requirements."

Similar provisions exist in the Sterling Company policy.

Proofs of loss were sent by insured to the companies February 2, 1927. About January 7, 1927, the insured inaugurated a fire sale to dispose of the damaged merchandise. A few days after the fire, a Mr. Cress, who was special agent of the Underwriters' Salvage Company of New York, went to Brinkley to assist in taking an inventory of the remaining and damaged stock, at the request of Coates & Raines, who were the general agents in Arkansas of the insurance companies holding policies on the stock, with the exception of the New York Company. Later a Mr. Overstreet, adjuster for the general agency of Coates & Raines, went to Brinkley for the purpose of adjusting the loss. He testified that he represented all the companies interested, except the New York Company. He offered insured $5,500 in full settlement of all the insurance policies. There

was evidence that he told John Malham, one of the partners, with reference to the $5,500, that that was all he would get, and, when asked by Malham as to what he was going to do with the stock, he said, "That's yours." Out of the fire sale the insured realized $1,623.25. A Mr. Watkins, conceded to be a representative of the New York Company, went to Brinkley February 2, 1927, to investigate and adjust the loss on behalf of his company. He found the salvaged stock had been sold, and testified that was the first he or his company knew of said sale. The New York Company claims that it never consented to the sale of the salvaged stock. After this sale the local agent of the New York Company at Brinkley, at the request of Mr. Malham, called up L. B. Leigh & Co., general agents of the New York Company, at Little Rock, who had charge of adjusting losses in Arkansas, and talked with them concerning a settlement of his loss. To this we advert later.

[1] Both insurance companies contend that the sale of the salvaged stock deprived them of their rights under the policy to examine the same and to have an appraisal, and, if they desired, to take it at its appraised value, or to replace the property lost or damaged with other of like character; that therefore the insured has violated the contracts, and cannot recover thereon. It is without question that the proofs of loss were not served until February, 1927. The sale of the salvaged merchandise was in the fore part of January. It would seem, therefore, that the provision of the contracts hereinbefore set out was violated, and that the insurance companies were deprived of a substantial right thereunder. If the salvaged property was sold without the consent of the insurance companies, the insured forfeited the right to claim indemnity, and, unless there was a waiver of such provision, the insured cannot recover on these policies. The doctrine is stated in 26 C. J. 366: "Under the provision which requires the insured to protect the property and separate the damaged from the undamaged property, etc., the insured cannot recover on the policy, in the absence of waiver, where he sells the property before the insurer has a reasonable opportunity to inspect it or appraise the damage." Astrich v. German-American Ins. Co. of New York (C. C. A.) 131 F. 13; Farmers' Merc. Co. v. Ins. Co., 161 Iowa, 5, 141 N. W. 447; Lancashire Ins. Co. v. Barnard (C. C. A.) 111 F. 702; Hamilton v. Liverpool, etc., Ins. Co., 136 U. S. 242, 10 S. Ct. 945, 34 L. Ed. 419; Thornton v. Security Ins. Co. (C. C. A.) 117 F. 773; Oshkosh Match Works v. Manches-

ter Fire Assur. Co., 92 Wis. 510, 66 N. W. 525.

[2] That forfeitures are not favored in law is axiomatic. Knickerbocker Life Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689. In May on Insurance, 272, it is said: "The courts will proceed with caution in determining the question of the liability of the insurer; but, when this liability is fixed by the capital fact of a loss within the range of their responsibility, they will be very reluctant to deprive the insured of the benefit of that liability, by any failure or neglect to comply with the mere formal requisitions of the contract, by which his right is to be made available for his indemnification." From the syllabus in German Insurance Co. v. Gibson, 53 Ark. 494, 14 S. W. 672, we quote: "Forfeitures are not favored in law; and any agreement, declaration, or course of action on the part of an insurance company, which leads a party insured honestly to believe that by conforming thereto a forfeiture of his policy will not be incurred, followed by conformity on his part, will estop the company from insisting upon the forfeiture."

[3] Waiver and estoppel may be inferred from the conduct of the insurance company. American Ins. Co. v. Dannehower, 89 Ark. 111, 115 S. W. 950; Pacific Mutual Life Ins. Co. v. Carter, 92 Ark. 378, 123 S. W. 384, 124 S. W. 764; Queen of Ark. Ins. Co. v. Forlines, 94 Ark. 227, 126 S. W. 719; Lord v. Des Moines Fire Ins. Co., 99 Ark. 476, 138 S. W. 1008; Inter-State Bus. Men's Acc. Ass'n v. Greene, 132 Ark. 546, 201 S. W. 799; Knickerbocker Life Ins. Co. v. Pendleton et al., 112 U. S. 696, 5 S. Ct. 314, 28 L. Ed. 866; Iowa Life Ins. Co. v. Lewis, 187 U. S. 335, 23 S. Ct. 126, 47 L. Ed. 204. The question of waiver or estoppel is of controlling importance in these cases.

[4, 5] If there was any waiver of the provision of the policies giving insurers the right to take the property at the appraised value or to replace same, it was through the acts of Overstreet in telling the assured to sell the salvaged goods, and standing pat on the offer of the $5,500 settlement, and stating assured would receive no more on all the policies. That Overstreet represented the Sterling Company is admitted. It is claimed he did not represent the New York Company in any way. Of course, if this is so, what he did or said was not binding on it unless subsequently ratified. The question therefore of whether Overstreet represented the New York Company at the time he went to Brinkley after the fire and before the salvage sale and made the offer of settlement on be-

half of all the insurance companies, or whether his acts in that respect were thereafter ratified, is a vital one in the New York Company Case. This is a fact question. It must be borne in mind that a jury was waived in writing and the case tried to the court. The rule under these circumstances is that the findings of the trial court on questions of fact will not be disturbed if there is any substantial evidence to support them. Boak v. Robie (C. C. A.) 16 F.(2d) 33. The record does not show that any requests were made for special findings of fact or conclusions of law. The finding of the court was general, and no special findings were made.

It is therefore doubtful whether the important questions now urged are before this court for review. Law v. United States, 266 U. S. 494, 45 S. Ct. 175, 69 L. Ed. 401; Fleischmann Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624. However, as that question has not been raised in this court, we have concluded to go into the matter to some extent.

In order to find for the insured, as the court did, it must of necessity have found that Overstreet represented the New York Company at the time he negotiated with the insured, and that he was authorized to represent it when he in effect told insured he could sell the damaged property, and that the $5,500 was all it would receive, or, if he did not then represent it, it ratified his acts. Was there any competent evidence to sustain such conclusion of the trial court? The record shows that Overstreet made the offer of $5,500 to settle all four policies, including the New York Company and the Sterling Company policies. We set out part of his cross-examination:

"By Mr. Bogle: Q. When you went down there to make this investigation, you kept the plaintiffs under the impression you represented all of the insurance companies, did you not? A. No, sir; I told him I had authority to make a settlement on that basis.

"Q. Why did you make an offer of $5,500 in full settlement of all the insurance claims? A. Because, as I stated to him, I had to take the matter up with the other company.

"Q. You didn't tell them anything about taking the matter up with the New York Underwriters, did you? A. No, sir; I didn't.

"Q. Then when you made this offer of settlement of fifty-five hundred dollars, you meant the New York Underwriters' Company to pay their part of it. A. All losses to be paid on that basis. The company I represent would pay an amount proportionate to that basis. I told him I would pay him on the basis of fifty-five hundred, pay all of the five hundred dollars on the furniture and fixtures and five thousand dollars on the stock of goods.

"Q. Did you tell Malham & Co. that? A. Yes; I did."

He talked with Watkins, conceded representative of the New York Company, about what he had done in attempting to adjust the loss on the basis of $5,500. We quote further from his testimony:

"Q. You did make a report to L. B. Leigh & Co.? A. No, sir; I told Mr. Watkins that I tried to adjust the loss on the basis of $5,500 and that he wouldn't accept it.

"Q. Why were you talking to him, if you didn't represent any other company? A. It was a conversation among adjusters.

"Q. Did you ever make adjustment for his company? A. No, sir; not authoritative. I have had losses referred to me by L. B. Leigh & Co. through Mr. Watkins, and they have accepted my adjustments.

"Q. And if this had gone through, he would have accepted this, too, wouldn't he?"

Overstreet had represented the New York Company in other matters. It is highly improbable that he would have made the offer to settle in behalf of all the companies if he had no authority to act in behalf of the New York Company.

One Chaney was agent at Brinkley of the New York Company. Some time after Overstreet had been at Brinkley, at Malham's request, Chaney called up Leigh & Co., who were general agents of the New York Company at Little Rock, and asked them concerning settlement. We set out a portion of his testimony, viz.:

"Q. Does your insurance agency represent the New York Underwriters' Insurance Company? A. Yes, sir.

"Q. I will ask you to state whether or not, after the Malham & Co. fire, after Mr. Overstreet had been down to make investigation, you called up L. B. Leigh & Co., general agents of the defendant underwriters? A. Yes, sir.

"Q. Did you call them up and talk to them in regard to this settlement? A. About a settlement?

"Q. Yes. A. I called up the office some time afterwards, but I don't remember how long that was.

"Q. It was after Mr. Overstreet had been there? A. Yes, sir; after—some time after he had been there.

"Q. You called up their office? A. Yes, sir; Mr. Malham asked me to call them up, and I called Mr. William Leigh, or Mr. Gil-

bert Leigh, and asked them if anything had been done about it, and he said he had talked to Mr. Watkins about it, and he said they weren't prepared at that time to say anything more than had been said.

"Q. I will ask you to state to the court if you asked them whether or not they would give them any greater amount than had been offered. A. Yes, sir; that is what I asked him, and he said he wasn't thoroughly familiar with it, and he said he would advise me later.

"Q. Did they ever advise you later? A. No, sir.

"Q. Never did? A. No, sir.

"Q. Immediately after this fire you notified the defendants New York Underwriters' Company of this loss, did you? A. Yes, sir.

"Q. That is all."

[6] This testimony is particularly important in that it shows one of the Leighs, when asked by Mr. Chaney about the settlement, said he had talked to Mr. Watkins about it, and that "they weren't prepared at that time to say anything more than had been said." What had been said? Who had said it? A court or jury would be warranted in inferring that this referred to what Overstreet had told Watkins concerning the attempt to adjust, and that the Leigh Agency was standing by what had been done by Overstreet with reference to an offer of settlement. If Overstreet did not have anything to do with the adjustment of the loss as far as the New York Company was concerned, why did he discuss it with Watkins? If Leigh & Co. were not fully cognizant of, and acquiescent in, what Overstreet had attempted to do in their behalf, why did one of the Leighs say to Chaney "that they weren't prepared to say anything more than had been said." That Overstreet made the offer of settlement in behalf of all the insurance companies is unquestioned. John Malham testifies, referring to the conversation with Overstreet: "He said that was all I was going to get. I hold him what I was going to do with the stock, and he said, 'That is yours.'" It is a matter of common knowledge that, where a loss occurs and is covered by a number of policies, it is seldom an adjuster appears for each one of the companies. [7-9] Under the evidence, a court would be warranted in finding that the insured believed Overstreet represented all the companies. Of course that is a mere circumstance in the general situation not necessarily binding on the New York Company, but it is hardly to be expected that an insured will investigate the authority of an adjuster who is endeavoring to settle an entire loss for the benefit of all the companies holding policies.

Certainly it would be unusual for an adjuster so to do where he had no authority to act for some of the companies. Slater v. Capital Ins. Co., 89 Iowa, 628, 57 N. W. 422, 23 L. R. A. 181; Searle v. Dwelling House Ins. Co., 152 Mass. 263, 25 N. E. 290; Ohio Farmers Ins. Co. v. Vogel, 166 Ind. 239, 76 N. E. 977, 3 L. R. A. (N. S.) 966, 117 Am. St. Rep. 382, 9 Ann. Cas. 91; Glazer v. Home Ins. Co., 190 N. Y. 6, 82 N. E. 727; Union Mutual Life Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617. The evidence is not strong on the question of Overstreet representing the New York Company, but we would not be warranted in holding that there was no substantial evidence to sustain the finding of the court on that question. The court having determined that Overstreet was authorized to adjust the loss in behalf of the New York Company, and that fact not being in dispute as to the Sterling Company, must have further determined the controverted fact questions as to just what Overstreet said and did at the time of the attempted adjustment, and whether the same was sufficient to constitute a waiver of the salvage provision of the contracts. This was in the nature of a mixed question of law and fact. We think the court did not err in holding that a ratification or waiver had been established, and, while the court made no such specific finding, it of necessity inheres in its general finding, as in our view of the case there could be no judgment for insurers unless there was a waiver of the salvage clause provisions of the policy. If the evidence of John Malham was true, and if Overstreet represented the New York Company as well as the Sterling Company, the court was warranted in holding that there was an election on the part of the insurance companies not to take the salvaged goods.

Both policies contain a provision under which the insured was to keep a detailed inventory, and also "a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, or this entire policy shall be null and void." A detailed inventory was kept. Daybooks also in the nature of merchandise sales books, which showed credit sales; also a ledger and a small cashbook, which showed the cash received but not the particular articles sold, nor the quantity thereof. It is contended that this clause of the contract, which is the usual record warranty or iron safe clause, was violated, and that therefore there can be no recovery on the policies.

[10, 11] Such clause in a policy is of course enforceable. Royal Ins. Co., Limited, of Liverpool, England, v. Kline Bros. & Co. (C.

C. A.) 198 F. 468; Wright v. Union Ins. Co. of Indiana (C. C. A.) 13 F.(2d) 612; Everett-Ridley-Ragan Co. v. Traders' Ins. Co. of Chicago, Ill., 121 Ga. 228, 48 S. E. 918, 104 Am. St. Rep. 99. The theory of the same is that the insurer may know from the books, aside from oral evidence, the amount of goods on hand at the time of the fire, and thus is prevented mistake, fraud, or overreaching. There is no particular divinity that surrounds this clause, nor is there any particular system of bookkeeping that must be used. The books of a country merchant can hardly be expected to exhibit the same accuracy as those of a large city institution. This clause has been of frequent consideration by the courts, and the proposition is now well established that a substantial compliance therewith is all that is essential. In Liverpool, etc., Ins. Co. v. Kearney, 180 U. S. 132, 136, 21 S. Ct. 326, 328 (45 L. Ed. 460), the Supreme Court of the United States, referring to a somewhat similar clause, said: "The covenant and agreement 'to keep a set of books, showing a complete record of business transacted, including all purchases and sales, both for cash and credit together with the last inventory of said business,' should not be interpreted to mean such books as would be kept by an expert bookkeeper or accountant in a large business house in a great city. That provision is satisfied if the books kept were such as would fairly show, to a man of ordinary intelligence, 'all purchases and sales, both for cash and credit.' There is no reason to suppose that the books of the plaintiff did not meet such a requirement." From 14 R. C. L. § 323, we quote: "The provision imposes on the insured the duty to preserve in intelligible form, in one or more books of his own choice, written evidence of his purchases, of his sales, and of his shipments. If such evidence be preserved, the insurer is guarded against the fraud and imposition of the insured, and this is the purpose to be accomplished. * * * There is a sufficient compliance where the insured keeps books showing how many goods were received, and how many were sold from the date of the issuance of the policy up to the time of the fire, or, if from the books kept by the insured, with the assistance of those who understand the system on which they were kept, the amount of purchases and the amount of sales can be ascertained, and cash transactions distinguished from those on credit, and it is not necessary that the particular articles bought and sold be shown."

[12] If the books themselves kept by the insured, unaided by oral testimony except to explain the method in which they were kept, furnish the requisite information necessary to determine the extent of the loss, the intent and purpose of such clause is accomplished. Joyce on the Law of Insurance (2d Ed.) vol. 3, § 2063u, says: "So there is a substantial compliance, where the books kept show the assured's daily cash sales and also with substantial certainty the extent to which the stock has been depleted and which enable assurer to determine therefrom, together with the last inventory and the books or invoices showing all purchases thereafter, the amount and value of the stock lost and the extent of liability."

Courts have refused to give a narrow and technical construction to such clauses in insurance policies, but have insisted upon a reasonable construction to prevent, if possible, a forfeiture. Ætna Ins. Co. v. Johnson, 127 Ga. 491, 56 S. E. 643, 9 L. R. A. 667, 9 Ann. Cas. 461; McNally et al. v. Phœnix Ins. Co. of Brooklyn, 137 N. Y. 389, 33 N. E. 475. Defendants in error emphasize on this question Pelican Insurance Co. v. Wilkerson, 53 Ark. 353, 13 S. W. 1103, and it is a strong authority on their theory of the construction of these clauses, but, in view of subsequent legislation in Arkansas and decisions of its courts, its strength is shorn. That case was decided in June, 1890. Since that time the state of Arkansas has enacted the following statute:

"Sec. 6148. *Substantial Compliance with Conditions.* In all actions against any fire insurance company, individual or corporation, for any claim accruing or arising upon or growing out of any policy upon personal property issued by any such company, individual or corporation, proof of a substantial compliance with the terms, conditions and warranties of such policy, upon the part of the assured, or party, individual, person or corporation to whom it may have been issued, or their assigns, shall be deemed sufficient, and entitle the plaintiff to recover in any such action. Act March 29, 1899, p. 142."

In Security Mutual Ins. Co. v. Woodson, 79 Ark. 266, 95 S. W. 481, 116 Am. St. Rep. 75, referring to this statute, the Supreme Court held that every policy of insurance on personal property written since the passage of that statute should be construed as if that part thereof were written in it. Prior to this statute, the Arkansas courts held that strict compliance was necessary. After that they adopted the doctrine of substantial compliance. In Arkansas Mutual Fire Ins. Co. v. Woolverton, 82 Ark. 476, 102 S. W. 226, the court held, with reference to the question of keeping a set of books under the terms of the policy, that the fact was established that

the method employed by the insured was the customary method of bookkeeping in vogue among the merchants in that locality, and that this was sufficient to show substantial compliance with that particular provision of the policy. In Arkansas Mutual Fire Ins. Co. v. Stuckey, 85 Ark. 33, 37, 106 S. W. 203, 204, it was said: "It devolved upon the insurance company, which claimed a forfeiture, to show that the method of bookkeeping practiced was not sufficiently intelligible to enable an adjuster to ascertain the amount and value of the property insured and lost."

In Western Assurance Co. v. Altheimer, 58 Ark. 565, 25 S. W. 1067, Greenwich Ins. Co. v. State, 74 Ark. 72, 84 S. W. 1025, and Yates v. Thomason, 83 Ark. 126, 102 S. W. 1112, the question of whether there had been a substantial compliance with such provision in the insurance policies involved, was held to be one for the jury.

[13] The trial court heard the evidence, and its conclusion evidently was that there had been substantial compliance with the requirements of the policies as to keeping books. While there may have been some difficulty in determining the loss from the books without the aid of oral explanation, nevertheless the evidence shows it could be done. Mr. Andrews, who had been a bookkeeper for many years and had had wide experience in accounting, testified as follows:

"Q. Could you, from the books alone, without what Mr. Malham told you, estimate his loss, or the amount of stock on hand? A. I could, but it would take some time. They had lots of merchandise they brought in there from time to time from the farmers that they made no record of."

This defense to the policies is not established.

The court awarded as against each company 12 per cent. of the amount of recovery as damages, and attorney's fees of $250 in each case. Complaint is made as to this. The Arkansas statute provides that, where a loss occurs under fire insurance policies and the company is liable therefor and fails to pay the same within the time specified in the policy after demand, the company shall be liable for 12 per cent. damages upon the amount of the loss, together with reasonable attorney's fees to be taxed by the court, to be collected as part of the costs. A statute of Texas (Rev. St. 1895, art. 3071) providing for damages of 12 per cent. on amount recovered in suits on insurance policies and reasonable attorney's fees has been sustained by the Supreme Court in Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922. It is an exercise of the police

power of the state. Kansas City Southern Ry. Co. v. Marx, 72 Ark. 357, 80 S. W. 579; Arkansas Ins. Co. v. McManus, 86 Ark. 115, 110 S. W. 797; Federal Union Surety Co. v. Flemister, 95 Ark. 389, 130 S. W. 574. This statute was in existence when the policies sued on were issued, and we see no reason why the insurance companies are not bound thereby.

[14] Plaintiffs in error claim (1) that the record fails to disclose any demand within the purview of the statute; and (2) that the damages and attorney's fees cannot be taxed as part of the costs, and that in so doing the federal statutes were violated. As to the first question, no formal demand it is true is shown, but the Supreme Court of Arkansas in Metropolitan Life Insurance Co. v. Shane, 98 Ark. 132, 137, 135 S. W. 836, 839, gives the answer thereto as follows: "It is not necessary that there should have been a formal demand for payment of the policy before the penalty for its nonpayment would attach. It is only necessary to show facts from which it can be reasonably inferred that the company understood that payment was demanded and that it refused to make same." See, also, Phœnix Ins. Co. v. Fleenor, 104 Ark. 119, 148 S. W. 650. It would seem that the insured was endeavoring to have his policies paid, and that the company understood that the payment was demanded.

[15] As to taxing attorney's fees in the federal court as costs, a late decision of the Supreme Court of the United States, February 20, 1928, in People of Sioux County, Neb., v. National Surety Co., 48 S. Ct. 239, 72 L. Ed. ——, is decisive. We quote from that decision as follows: "Whether this liability for an attorney's fee, assumed by entering into an insurance contract after the enactment of the statute providing for the liability, may be enforced in the federal courts, does not depend on any nice distinctions which may be taken between the right created and the remedy given. Disregarding mere matters of form, it is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts."

[16] The questions thus far discussed are common to both petitions in error. We refer now to the matters urged in the Sterling Company Case, not relied on in the New York Company Case. In the Sterling Company Case it may be noted that there is no question

as to the authority of Overstreet. The Sterling Company therefore has less to complain of in the decision of the trial court than has the New York Company. The Sterling Company insists that the proofs of loss were false and fraudulent, and therefore the policy was violated. Columbian Ins. Co. of Indiana v. Modern Laundry C., Inc. (C. C. A.) 277 F. 355, 20 A. L. R. 1159; Claflin v. Commonwealth Ins. Co., 110 U. S. 81, 3 S. Ct. 507, 28 L. Ed. 76. The court probably would have been justified in finding that the proofs of loss were waived by the statements of Overstreet that all the companies would pay was the $5,500, as it seems to be the Arkansas doctrine that, where an insurance adjuster makes an offer of settlement and states that he proposes to stand on the offer so made, the furnishing of proof of loss is waived. Greenwich Ins. Co. v. State, 74 Ark. 72, 84 S. W. 1025; Security Mutual Ins. Co. v. Woodson, 79 Ark. 266, 95 S. W. 481, 116 Am. St. Rep. 75. Passing that, however, we think it could not well be claimed that, because Joe Malham swore to an affidavit to the proof of loss that the amount of goods on hand at the time of the fire was $25,916.25 and that the total loss was $24,423.20, his affidavit was necessarily willfully false and fraudulent, in view of the fact that the trial court found the damage—that is, the loss—to be $21,000. This is not so far out of line with the amount stated in the proofs of loss as to warrant the assumption that the affidavit was willfully false. Fidelity-Phenix Fire Ins. Co. v. Friedman, 117 Ark. 71, 174 S. W. 215.

[17] It is also urged as error that the court permitted an inventory compiled from yearly invoices to be introduced as evidence of the stock of goods on hand at the time of the fire. Regardless of the question of whether proof of loss was waived, the record shows that books of the insured were introduced showing the amount of merchandise purchased in 1926, and that, in addition thereto, all the invoices were introduced, so that, whether the items of loss in the inventory were copied from the books, or the invoices, would seem to be immaterial.

[18, 19] It is also urged that no waiver was pleaded. Although not required in Arkansas, the pleading of a waiver would have been a more orderly procedure, but the case seems to have been tried on the theory of a claimed waiver of certain provisions of the policies. No objection was made to the evidence bearing thereon on the ground that there was no pleading raising the question, and, after the case has been tried on that theory, it would be highly technical to raise the question now.

The court should have permitted the witness Watkins to testify that Cress and Overstreet were not representatives of the New York Company. These parties, however, testified to that matter themselves, so it was before the trial court, and the evidence of Watkins would be merely cumulative. Hence the error was without prejudice. Regardless of whether a number of the questions raised are properly before us, we have reached the conclusion that the judgment of the trial court in both cases should be affirmed and it is so ordered.

Affirmed.